**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE – OPELOUSAS DIVISION**

| | | |
|---|---|---|
| **RESA LATIOLAIS** | * | **CIVIL ACTION NO. : 6:09-CV-00018** |
| | * | |
| **VERSUS** | * | **JUDGE MELANCON** |
| | * | |
| **MR. BRADLEY GRIFFTH, et al.** | * | **MAGISTRATE JUDGE HANNA** |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION FOR SUMMARY
JUDGMENT OF ROYLIS GALLOW AND THE CITY OF OPELOUSAS**

Plaintiff, Resa Latiolais, submits this memorandum in opposition to the Motion for Summary Judgment filed on behalf of Defendants, Roylis Gallow and the City of Opelousas. The motion is set for hearing on June 24, 2010 without oral argument.

Respectfully submitted,

**JULIE KOREN VAUGHN FELDER, APLC**

JULIE VAUGHN FELDER #25047
P.O. Box 80399
Lafayette, Louisiana 70598
Telephone: (337) 856-3444
Facsimile: (337) 856-3447

AND

**HUVAL, VEAZEY, FELDER,**
**AERTKER & RENEGAR, LLC**

**BRADFORD FELDER #25046**
G. ANDREW VEAZEY #21929
STACY N. KENNEDY #23619
2 Flagg Place
Lafayette, LA  70508
Telephone:  (337) 234-5350
Facsimile:  (337) 234-5310
**ATTORNEYS FOR PLAINTIFF, RESA LATIOLAIS**

# I. <u>TABLE OF CONTENTS</u>

I.     TABLE OF CONTENTS ...................................................................................ii

II.    TABLE OF AUTHORITIES.............................................................................. iii

III.   FACTUAL AND PROCEDURAL HISTORY ....................................................1

IV.    LAW AND ARGUMENT..................................................................................12

     A. Introduction ............................................................................................12

     B. Specific Claims........................................................................................13

          1.  Conspiracy Claim under 28 USCA §1983 .................................14

          2.  Qualified Immunity ....................................................................24

          3.  Witness Immunity.......................................................................25

          4.  State Law Claims........................................................................27

               a.   Conspiracy to Abuse the Judicial Process ........................27

               b.   Conspiracy to Commit Fraud/Deceit.................................28

               c.   Intentional Infliction of Emotional Distress .....................28

               d.   Invasion of Privacy ...........................................................29

               e.   False Arrest and Imprisonment..........................................29

               f.   Harassment and/or Stalking...............................................29

          5.  Prescription ................................................................................30

          6.  Vicarious Liability of the City of Opelousas..............................33

          7.  Damages .....................................................................................35

V.     CONCLUSION .................................................................................................35

## II.  **TABLE OF AUTHORITIES**

**Cases:**

*Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982)..............................................26

*Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 387 (5th Cir.1985)............................23

*Braud v. Painter*, 730 F.Supp. 1 (M.D. La. 1990).........................................................33

*Briscoe v. LaHue*, 460 U.S. at 333, 103 S.Ct. at 1114 ..................................................26

*Broussard v. Broussard*, 544 So.2d 109 (La.App. 3 Cir. 1989)....................................27

*Bustamento v. Tucker*, 607 So.2d 532 (La. 1992) .............................................30, 31, 32

*Butz v. Lynch*, 97-2166 (La.App. 1 Cir. 4/8/98), 710 So.2d 1171 ................................22

*Chrysler Credit Corp. v. Whitney Nat'l Bank*, 51 F.3d 553 (5th Cir. 1995)..................32

*Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994) .............................................................23

*Coulon v. Witco Corp.*, 03-208 (La.App. 5 Cir. 5/28/03), 848 So.2d 135 ....................31

*Crowe v. Lucas*, 595 F.2d 985 (5th Cir. 1979) .......................................................23, 25

*Ducote v. City of Alexandria*, 95-1269 (La.App. 3 Cir. 7/17/96), 677 So.2d 1118 ......35

*Edmond v. Hairford*, 539 So.2d 815 (La.App. 3 Cir. 1989).........................................27

*Gomez v. Toledo*, 446 U.S. 635, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980)..................23

*Hardy v. Bowie*, 98-2821 (La. 9/8/99), 744 So.2d 606..................................................34

*Hodorowski v. Ray*, 844 F.2d 1210 (5th Cir. 1988).......................................................14

*Irvin v. Foti*, 1999 WL 504916 (E.D. La. 1999)............................................................14

*Marrogi v. Howard*, 805 So.2d 1118 (La. 2002)...........................................................25

*National Union Fire Ins. Co. v. Spillars*, 552 So. 2d 627 (La. Ct. App. 1989), *writ denied*, 556
   So. 2d 61 (La. 1990) ....................................................................................................32

*Norris v. King*, 355 So.2d 21 (La.App. 1 Cir. 1978) .....................................................29

*Risin v. D.N.C. Investments, LLC*, 05-415 (La.App. 4 Cir. 12/7/05), 921 So.2d 133 .............30, 32

*Robertson v. Plano City of Texas*, 70 F.3d 21 (5th Cir. 1995) ................................................14, 22

*Scott v. The American Tobacco Company, Inc.*, 04-2095 (La.App. 4 Cir. 2/7/07)
   949 So.2d 1266 ........................................................................................................30

*South Central Bell Telephone Co. v. Texaco, Inc.*, 418 So.2d 531 (La. 1982)..............................30

*Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).....................................12

*State of Louisiana v. Johnson*, 438 So.2d 1091 (La. 1983) ...............................................23, 30, 32

*Turner v. Houma Municipal Fire*, 2002 U.S. Dist. Lexis 12924 (E.D. La. 2002) .......................34

*White v. Rapides Parish School Board*, 03-1172 (La.App. 3 Cir. 3/3/04), 967 So.2d 146 ...........35

*White v. Taylor*, 959 F.2d 539 (5th Cir. 1992) ...............................................................................25

*Wilson v. Hartzman*, 373 So.2d 204 (La.App. 4 Cir. 1979) ..........................................................31

*Wooley v. City of Baton Rouge*, 211 F.3d 913 (5th Cir. 2000)................................................13, 14

**Statutes:**

28 USCA §1983..............................................................................14, 22, 23, 24, 27, 33

LSA-R.S. 9:2798.1 .......................................................................................................34

LSA-R.S. 14:285 ..........................................................................................................30

LSA-R.S. 15:455 ...............................................................................................23, 30, 32

LSA-C.C. art. 1799........................................................................................................33

LSA-C.C. art. 1953........................................................................................................28

LSA-C.C. art. 2315...................................................................................................26, 27

LSA-C.C. art. 2324(A) ..................................................................................................32

LSA-C.C. art. 3503........................................................................................................33

### III. FACTUAL AND PROCEDURAL HISTORY

For the Court to understand the heinous nature of the conspiracy against Plaintiff which included orchestrated arrests, criminal prosecutions, coercion of Plaintiff's teenage daughter to make false allegations of abuse to the police, the removal of Plaintiff's son by OCS for bogus charges of child abuse, and much more, the facts are delineated in significant though not exhaustive detail.

On September 23, 2005, with Hurricane Rita advancing, Resa Latiolais ("Resa") evacuated Lafayette with her four-year-old son, Cole, her sixteen-year-old daughter, Lana, and Greg Chappell ("Greg"), who at the time was a friend she knew from church.   Cole's father, Defendant, Brad Griffith ("Brad") was invited to travel with them but declined.   When Brad learned that Greg accompanied Resa, he became jealous and began plotting the events that have led the parties to this Court.   Brad retained his attorney, Diane Sorola, on September 26, 2005, and on October 5, 2005, filed for *sole custody* of Cole with Resa to have only *supervised visitation*.   In its Reasons for Ruling, the trial court noted that Brad's Petition "was devoid of any specific facts other than a statement that Resa "has lately not made choices which are in the child's best interest and has been hurtful to the child."[1]   Brad was aware of this deficiency and concocted a scheme to create the facts he needed to take custody of Cole away from Resa.

Prior to October 5, 2005, Resa had never been involved in any civil or criminal matter nor had the police shown up at her home.   Between October 5, 2005 and December 8, 2005, due to Brad's schemes, Resa was investigated for food stamp fraud, investigated by OCS on two

---

[1] Exhibit 94, p. 3.   For those exhibits listed in the Pre-Trial Order that are cited herein, the original exhibit numbers have been used.   For references to prior sworn testimony taken in the matter Bradley Griffith v. Resa Latiolais, Docket No. 2005-5193-H3, Lafayette Parish, Louisiana and other exhibits not listed in the Pre-Trial Order, exhibit letters are used.   For references to page numbers of the sworn testimony taken in the custody trial and exhibits introduced therein, are to the bates-stamped numbers.   Please also note the provisions of the Pre-Trial Order regarding stipulations to authenticity and admissibility.   Lastly, please see the Memorandum in Opposition to Donald Cravins' Motion for Summary Judgment regarding the admissibility of sworn testimony from prior proceedings as appropriate evidence for summary judgments.

occasions on trumped up charges, confronted by police officers on several occasions, reported for criminal damage to property, and charged with simple battery.   In July 2006, she was harassed to the point of seeking court intervention, had retaliatory restraining orders taken against her, and she was arrested for aggravated assault.  Brad's involvement with all of this is well documented through his cell phone records to the various confederates involved in his schemes.[2]

As established with cell phone records and testimony at trial, Brad began meeting with Resa's sixteen year-old daughter, Lana, each morning from October 23, 2005 through October 26, 2005, unbeknownst to Resa.  During those meetings Brad told Lana that her mother did not love her, that she wanted to abort her brother, Cole, and that she was abusing Cole.  To arrange the meetings, Brad spoke directly with Jessica Harbin, a fourteen year-old girl who lived with her mother, Jan Huffman, and who attended the same school as Lana.  At Brad's request, Jessica called Lana to assist in the effort to turn Lana against Resa and to gather information helpful to the conspiracy.  Brad's efforts resulted in Lana acting incorrigibly toward Resa to the point that on October 25, 2005 Resa ended up slapping Lana.[3]

The next day, Lana told Jan Huffman about the incident with Resa and Jan convinced her that she must report Resa for child abuse.  Jan and Jessica brought Resa to see Carencro police chief, Carlos Stutes, to report child abuse.  Brad met Jan, Jessica, and Lana at the Carencro police station.  Chief Stutes determined that he did not have jurisdiction and called the Lafayette

---

[2] Exhibit "A,", R. Vol. IV, pp. 942-47 (Testimony of John Broussard); Exhibit "B," Vol. VIII, pp. 1966-68, 1987-88 (Testimony of Alex Montgomery); Exhibit "C," Vol. IX, pp. 2181-87, 2197, Vol. X, pp. 2203-06, 2209-11 (Testimony of Resa Latiolais); Exhibits 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 21, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49 50, 51, 52, 58, and 64.   To reduce the number of footnotes, citations to supporting documentation often appear at the end of paragraphs rather than at the end of each sentence.
[3] Exhibit "D," R. Vol. IV, pp. 954-56, 958 (Testimony of Janet Huffman); Exhibit "E," Vol. V, p. 1056 (Testimony of Margot Hasha); Exhibit "F," Vol. VI, p. 1281 (Testimony of Resa Latiolais); Exhibit "G," Vol. IX, p. 2093 (Testimony of Juanita Menard); Exhibits 12(pp 1541 & 1544), 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, and 53.

Parish Sheriff's Department who dispatched Deputy Dirk Campbell.  Deputy Campbell was the boyfriend of Jan's daughter, Danielle.  Deputy Campbell interviewed Lana and took her statement at the Carencro police station. He left Lana in Jan's care.[4]

Jan, Jessica, Lana, and Brad then drove to El Portillo, a Mexican restaurant on the North side of Lafayette.  After a while, the Lafayette Parish Sheriff's office was called again regarding a second report of abuse by Lana.  Deputy Campbell met Jan, Jessica, Lana, and Brad at El Portillo.  This time, Lana reported that Resa abused Cole.  Brad denied being present, but Deputy Campbell testified that Brad was sitting two chairs away from Lana as she made the report.  Jan then brought Lana to Charisma, one of Brad's businesses, where she received free clothes, a new cell phone, some money, and a promise of the use of a limousine for her graduation.[5]

Based on Lana's second report, Deputy Campbell called the Office of Community Services ("OCS") to report child abuse, and Cole was removed from Resa's care by the police that night and given to Brad.

On October 28, 2005, Brad had Lafayette Police officer, Theresa Boatner, a friend and the lover of one of his tenants, prepare a police report of criminal damage to property alleging Resa and Greg broke his truck window.  The report was submitted with a notation that the victim, Brad, did not wish to press charges so the District Attorney never took action.  Nevertheless, Brad subpoenaed the false report from the police department to use against Resa at trial.[6]

---

[4] Exhibit "H," R. Vol. IV, pp. 958-960, 988 (Testimony of Janet Huffman); Exhibit "I," Vol. V, pp. 1030-31, (Testimony of Dirk Campbell).
[5] Exhibit "J," R. Vol. IV, pp. 963-64 (Testimony of Janet Huffman); Exhibit "K," Vol. V, pp. 1029-33(Testimony of Dirk Campbell); Exhibit "L," p. 1069 (Testimony of Margot Hasha), Exhibit "M," Vol. VIII, p. 1972 (Testimony of Alex Montgomery).
[6] Exhibit "N," R. Vol. VI, p. 1411, Vol. VIII, p. 1759 (Testimony of Bradley Griffith); Exhibit "4" (transcript attached and CD-Rom of recording submitted under separate cover).  The parties have stipulated to the authenticity of the recording which is Plaintiff's Exhibit # 4.  The recording was confirmed by Cindy Hebert's sworn testimony in Exhibit "O," R. Vol. V, p. 1132, ll. 14 - p. 1135, ll. 5 (Testimony of Cindy Hebert).

That same day, two days after the report of "child abuse," OCS determined there had been no abuse and required Cole be returned to Resa.   Lafayette Police Officer Alex Montgomery called Brad to advise that he must return Cole to Resa.   Brad asked Officer Montgomery what would happen if he refused, so Officer Montgomery decided to send two police cars to Charisma to ensure Cole's return went smoothly.   When Resa arrived at Charisma, Officer Theresa Boatner was there and, it later was determined, Brad's personal private investigator, Robert Williamson, was hiding in the parking lot taking photographs of the exchange.   According to the testimony of Lafayette Police Officer Ron Robicheaux, who was there at the request of Officer Montgomery, Brad was screaming irately in the parking lot and making quite a scene.   The photographs taken by Williamson were later introduced into evidence in an effort to show that Resa had somehow orchestrated a lot of unnecessary drama during the exchange of Cole, and based upon the trial court's comments, the photos had the intended effect.[7]

On November 4, 2005, Resa filed a stay away order against Brad on behalf of Lana after learning from Lana about her contact with Brad, Jan, and Jessica.   On November 10, 2005, the trial court granted an injunction prohibiting Brad, or third parties acting on his behalf, from contacting Lana.[8]

Before the next plot is explained, a little history on one of the participants is needed. Cindy Hebert is Brad's girlfriend of twenty years with whom he had a daughter, Paige Griffith. Cindy was criminally prosecuted and served probation for threatening to kill Resa.

---

[7]Exhibit 24,  R. Vol. I, pp. 682-686 (Ruling of the Court); Exhibit "P," Vol. VI, pp. 1412-14, 1432 (Testimony of Bradley Griffith); Exhibit "Q," Vol. VIII, pp. 1972-80, 1990-91 (Testimony of Alex Montgomery); Exhibits 9, 10, & 11.
[8] Exhibit "R," R. Vol. I, pp. 33-42, 66, 59, 104, (Pleadings and partial transcript related to TRO, *in globo*).

4

On November 30, 2005, Brad was to meet Resa with Cole at McDonald's at 7:30 a.m. so Resa could take Cole to the lab at Opelousas General Hospital for a test ordered by Cole's physician.  When Brad failed to show up at McDonald's, Resa began calling his cell phone but he did not answer.  Brad eventually answered his cell phone and told Resa that he was at Opelousas General with Cole.  Resa hurried over to Opelousas General since she had the order for the lab work and to be with Cole for the test.[9]

After arriving at the hospital, Resa still could not find Brad and Cole because while Brad kept telling her he was in the hospital, he was not.  Resa noticed Officer Ricky Gallow in the hospital talking on his cell phone.  Resa approached him to request his assistance.  Officer Gallow followed Resa as she walked to find Brad, and when she did, Cindy Hebert was with him.  Resa, already upset about Brad's stunt, was further aggravated to see the woman who served parole for threatening to kill her there with her child.  She walked over, took Cole from Brad, and turned to head to the lab.  Cindy stood in her path and said "you don't deserve your son."  Resa pushed past Cindy and walked to the lab.  Officer Gallow called for backup, and when Resa returned from the lab, there were numerous police officers there.  Resa was cited with simple battery.[10]

Through cell phone records, it was established at trial that it was Brad with whom Officer Gallow was on the phone when Resa walked up that morning.[11]  As the trial court found, Brad had arranged for Gallow to be present that morning so that he could orchestrate an event in which he would have a "disinterested" police officer witness behavior on the part of Resa about which he could testify, and again it worked, at least initially.  Not having the financial resources to fight the criminal charge, and not being able to prove at the time the connection between

---

[9] Exhibit "S," R. Vol. VI, pp. 1291-98 (Testimony of Resa Latiolais).
[10] *Id.*
[11] Exhibit 58, p. 841; Exhibit 59, p. 890; Exhibit 73, pp. 1610, 1631.

Officer Gallow and Brad, Resa pleaded *nolo contendre* to the battery charge.  The incident, as relayed by Officer Gallow in his testimony in the custody trial on January 19, 2006, along with the constant charges of child abuse, were used by Dr. LeCorgne to paint Resa as having anger and impulse control problems and being a potential danger to Cole, and Brad was actually commended by the trial court for his wise decision to "stay out of the fray" during the incident.

On that same day, November 30, 2005, Brad brought Cole to a pediatrician who had never seen Cole before, Dr. Carmen Koubicek, once again claiming child abuse.  Brad had been arranging this visit while Resa was looking for him at the hospital.  Brad told Dr. Koubicek that a bruise on Cole's arm was caused by Greg Chappell pinching Cole and that a bruise on Cole's buttock was caused by Resa spanking Cole with a spoon.  Based upon Brad's allegations, Dr. Koubicek called OCS to report Resa.  She testified that OCS never called her back.[12]

Two days later, on December 2, 2005, Brad had Carlos Stutes, the Sunset police chief, send police officers to Lana's school, pull her out of class, and ask her if she was alright.  This was in direct violation of the restraining order against Brad.  However, when counsel for Resa moved for Brad to be found in contempt, the trial court commented that Brad would be "insane" to use the police to violate the restraining order and therefore denied the motion to find Brad in contempt.  During that hearing, the trial court admonished *both* parties for the involvement of so many third parties in this matter and stated this was the "worst start" to litigation he had seen since he started practicing law.  The trial court failed to note that every single one of the third parties to which he referred were connected to Brad, not Resa.[13]

---

[12] Exhibit "T," R. Vol. VI, pp. 1427, 1430 (Transcript of Bradley Griffith); Exhibit 5, pp. 197, 199, & 126 (Deposition transcript of Dr. Carmen E. Koubicek).
[13] Exhibit 24, pp. 682-686, 689, 691, and 700 (Ruling of the Court); Exhibit "U," Vol. IX, p. 2180 (Testimony of Resa Latiolais).

At some point between the date the OCS investigation was closed on December 20, 2005 and January 25, 2008 when the investigating officer, Detective Alex Montgomery testified, Senator Donald Cravins, Sr. called Detective Montgomery and pressured him "to help Brad out" in the custody trial.[14]

On January 30, 2006 and March 20, 2006, Resa appeared in court in St. Landry Parish regarding the November 30, 2005 incident with Cindy Hebert.   On both dates, Brad had telephone conversations with Officer Gallow who was present at the court proceedings to testify against Resa.[15]

On April 7, 2006, Jessica Harbin began a pattern of harassment that led to multiple hearings before various judges and ultimately to Jessica's arrest.  Between April 7, 2006 and April 19, 2006, she called Resa to harass her no less than 50 times.  Jessica usually called Brad before and after she called Resa.[16]

On April 20, 2006, Dr. LeCorgne issued his report on the mental health evaluations of Resa and Brad.  Based upon that report, which was largely premised upon the November 30, 2005 incident at Opelousas General Hospital, on May 1, 2006 the trial court *took custody away from Resa*, gave it to Brad, and required a portion of Resa's visitation to be *supervised*.[17]

On May 17, 2006, the harassment by Jessica Harbin continued.   On May 18, 2006, Jessica called Resa 23 times.  On July 7, 2006, Jessica was arrested for making harassing phone calls to Resa and Lana.  That day Jessica's mother, Jan, was videotaped sitting in front of Resa's house honking her car horn trying to intimidate Resa.  On July 17, 2006, Jan and Jessica filed for

---

[14] Exhibit "V," R. Vol. VIII, pp. 1969-1989 (Testimony of Alex Montgomery).
[15] Exhibit 59, pp. 841 & 890; Exhibit 73, pp. 1618-20.
[16] Exhibit "W," R. Vol. VIII, p. 1996, Vol. IX, pp. 2004-05, 2013-15 (Testimony of Kevin Stelly); Exhibit 45, pp. 764-65.
[17] Exhibit "X," R. Vol. I, pp. 161-66 (Transcript of May 1, 2006 proceeding); Exhibit Y, Records of Dr. Lyle LeCorgne on which his recommendations to the trial court were based, pp. MED.0009.LLL, MED.0018.LLL, MED.0040.LLL – MED.0043.LLL, MED.0091.LLL – MED.0092.LLL  (under seal).

retaliatory TROs against Resa, Greg, and Lana.  On July 20, 2006, Jessica was arrested again for violating the TRO secured by Resa.[18]

From July 15, 2006 through August 15, 2006, Cindy Hebert and Brad were having difficulty and Brad threw Cindy and their sixteen-year-old daughter, Paige, out of their home, changed the locks, closed Cindy's bank accounts, fired her from her job, and took her van.[19] Cindy became afraid that Brad was going to take Paige from her the way he had at that point successfully taken Cole from Resa.  As a result, Cindy contacted counsel for Resa who recorded the conversation.  In that conversation, Cindy detailed some of the steps Brad had taken to set Resa up, Brad's involvement with dirty cops and various public officials, and a whole laundry list of illicit activity about which she was aware.  Cindy gave names, not just generalities, and the entire recording, which was played into the record of the custody trial, is enlightening.  Some of the most pertinent details include the following:

| | |
|---|---|
| Cindy: | Brad has got a lot of people in his pocket and I mean, he has done things in [Resa's] case, that honestly, if the psychologist knew the truth, he never would have made the decision he did in the first place. |
| Felder: | So you don't feel that the psychologist was given the full picture? |
| Cindy: | Definitely not. |
| Felder: | Do you think he lied to them specifically? |
| Cindy: | Oh, I know he did … [about] everything, everything.  I mean just the way he lives his life.  It's all not true.  I mean none of it, you know?  … I mean he is getting Resa's phone records illegally, I mean, you name it. |
| | |
| Cindy: | He does favors for people that in turn do favors for him. |
| Felder: | And just who are those people specifically? |
| Cindy: | Oh, God, just about everyone. … Any cop you can possibly imagine. |

---

[18] Exhibit "Z," R. Vol. IV, pp. 993-95 (Testimony of Janet Huffman); Exhibit 60, 61, 62, and 64; Exhibit "4" (transcript attached and CD-Rom of recording submitted under separate cover).  The parties have stipulated to the authenticity of the recording which is Plaintiff's Exhibit # 4.  The recording was confirmed by Cindy Hebert's sworn testimony in Exhibit "O," R. Vol. V, p. 1132, ll. 14-p. 1135 ll. 5 (Testimony of Cindy Hebert).  Brad also filed for a TRO against Greg.  See Exhibit 54.

[19] Exhibit "AA," R. Vol. V, pp. 1135-40 (Testimony of Cindy Hebert); Exhibit "4" (transcript attached and CD-Rom of recording submitted under separate cover).  The parties have stipulated to the authenticity of the recording which is Plaintiff's Exhibit #4.  The recording was confirmed by Cindy Hebert's sworn testimony in Exhibit "O," R. Vol. V, p. 1132, l 14-p. 1135 l. 5 (Testimony of Cindy Hebert).

| Cindy: | [Brad said] he should have planted drugs on [Resa] and gotten it over with in the beginning. |
|---|---|
| Felder: | Theresa Boatner, what is his connection to her? |
| Cindy: | They are really good friends. She used to live in his apartment complex, and I think now her ex-lover lives in the apartment complex, or she did when I left, I don't know. |
| Cindy: | The way Brad works is if he can't have you, he'll destroy you, so nobody else can have you so…. He needs some help.[20] |

On September 26, 2006, Jessica Harbin had Resa arrested for allegedly committing aggravated assault by trying to run over Jessica with her car. Those charges were eventually dropped, but not before the request for a TRO filed by Jan and Jessica was finally heard on October 20, 2006. The evidence presented was completely manufactured, but the trial court (a different judge not acquainted with the history between the parties) granted the TRO.

In mid-October 2007, Brad used Jan and Jessica in an effort to prohibit Resa from videotaping the exchanges of Cole. This Court should note that the trial court specifically provided in its Judgment that the parties could videotape the exchanges "in light of all of the problems in this case." Brad had consistently tried to have various courts order that exchanges not be videotaped. In one effort, on September 18, 2007, Brad filed a Petition for Temporary Restraining Order, Preliminary and Permanent Injunction against Greg.[21] In that Petition, Brad complained of the fact that Greg filmed the exchanges between Resa and Brad on August 31, 2007 and September 4, 2007.[22] An initial hearing on the Injunction was held on October 15, 2007 and a review of the exchange between counsel before Judge Conque in that proceeding shows that the real reason Brad brought the proceeding was to have the court order that no one

---

[20] Exhibit "4" (transcript attached and CD-Rom of recording submitted under separate cover). The parties have stipulated to the authenticity of the recording which is Plaintiff's Exhibit # 4. The recording was confirmed by Cindy Hebert's sworn testimony in Exhibit "O", R. Vol. V, p 1132, ll. 14 – p. 1135, ll. 5 (Testimony of Cindy Hebert).

[21] Exhibit 54, p. 799.

[22] *Id.* at 803.

videotape the exchanges between Resa and Brad.  Counsel for Brad wanted that court to hold

that the videotaping was "stalking" so that it could be prohibited.[23]  Counsel for Resa refused to

allow her client to agree to quit videotaping the exchanges.[24]

The very next day, October 16, 2007, Brad attempted to use Jan and Jessica to require

Resa to stop videotaping by having them orchestrate an encounter in which they would claim

that Resa was violating the restraining order they obtained against Resa by videotaping them.

Had it not been for what Resa's videotape actually showed regarding that incident, Resa would

have been arrested in front of Cole.  Resa explained the incident as follows:

Q:     Do you feel safe in your vehicle?

A:     No, not at all.

Q:     Can you tell this Court why?

A:     Because I was accused of trying to run over Brad.  I was accused of trying
       to run over Jessica.  I was accused of trying to run Jessica and them off the
       road.  I was accused of just one thing after another.

Q:     Has having the video camera installed in your vehicle helped with that
       situation?

A:     Yes, it has.

Q:     Can you explain?

A:     On October 15th [2007], if I would have not videoed that incident of
       Jessica and Jan following me, passing me up, taking pictures of me, and
       then in turn telling the police officer that I was the one who was following
       them, then I would have gone to jail.  I showed the police officer.  Wait a
       minute.  Let me show you.  I was videoing this and they are the ones who
       was following me.  They are the ones who passed me up.  They are the
       ones who took the pictures of me behind them after they passed me up.
       Okay.  And that saved me from going to jail.  If I would not have had that
       video camera, I would have gone to jail that night.  And what kind of
       mother could I have been if I would have been in jail again to Cole.

---

[23] *Id.* at 811-13.
[24] *Id.*

10

Q:    And Cole was with you that night, wasn't he?

A:    Yes, he was.

Q:    How did you respond when Brad requested that you remove the video camera from your vehicle the day prior to that in December of '07 [sic]?

A:    I just can't see how I can because he continues to lie and say – but he has someone with him constantly. He can afford to pay someone to ride with him. I don't have the luxury he does. People that I know are working people, have other lives besides something needing to be in the middle of drama. And I need the video because he is always making up false allegations. The reason he doesn't want the camera in there is because his witness can say whatever. He can say whatever. Who do I have to protect me? Nothing except the camera.

Q:    And the day you were talking about the police showing up to arrest you, that was actually the October 16th, '07?

A:    That's correct. Because the day was the 15th we had gone to court, right, it was the next day.

Q:    And the 15th of October, what had happened?

A:    We had gone to court for the temporary restraining order and Brad really insisted that the video camera not be used. And the next thing, Jan and Jessica are following me back from where I had picked up Cole from McDonald's and followed me all the way back into Carencro and accused me of videoing them and that that was a violation of the restraining order and tried to get the police officer to arrest me on that also.

Q:    What are your concerns if this Court is to order that you not have a video camera in your vehicle anymore?

A:    It terrifies me. It really does. It really does. What happens if I'm convicted on something that I didn't even do. And here I am supposed to be the best mother that I can be to Cole. And then what would happen then?[25]

The trial court's Reasons for Ruling includes a long recitation of the facts regarding

Brad's contact with Jessica and her mother Jan and concludes with the following statements:

After reviewing the massive numbers of telephone communications and hours of telephone calls between Brad and

---

[25] Exhibit "BB," R. Vol. X, pp. 2206-08 (Testimony of Resa Latiolais).

11

Jan Huffman, and Brad and Jessica Harbin, as well as the timing of these calls, the Court has no doubt that Brad not only ignored this Court's strong suggestion, but actually used these women to attempt to get Resa in criminal trouble and cause her stress and anxiety as a tactic to win custody of Cole.[26]

The twelfth and last day of trial was January 28, 2008. The trial court's Reasons for Ruling were issued on March 27, 2008. In spite of continuous efforts on the part of Resa and her counsel to increase Resa's visitation after the travesty that occurred on May 1, 2006, Resa was limited to visitation with Cole on alternating weekends and one day during the off-week for nearly two years. Resa filed the instant action on January 8, 2009.

This matter was set for trial on March 29, 2010, but at the pre-trial conference on March 3, 2010, the Court ordered new counsel enroll for the defendants, the City of Opelousas and Donald Cravins. The Court also set various deadlines for additional discovery and dispositive motions. The various motions for summary judgment are set to be heard without oral argument on June 24, 2010.

### IV.  LAW AND ARGUMENT

**A. Introduction**

The United States Supreme Court has explained the importance of the rights of a parent in terms that make it clear that such rights are among those unalienable rights, endowed by our Creator, upon which our country was founded. In *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972), the Supreme Court stated:

> The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights.

(Citations and internal quotation marks omitted.)    The court also recognized that "the integrity of the family unit has found protection in the Due Process Clause of the Fourteenth

---

[26] Exhibit 94, p. 6.

Amendment." *Id.*, 405 U.S. at 651, 92 S.Ct. at 1213, 31 L.Ed.2d at 559; *Wooley v. City of Baton Rouge*, 211 F.3d 913, 921 (5th Cir. 2000).

The actions of the many tortfeasors listed above, both named defendants and unnamed co-conspirators, clearly show a scheme devised to deprive Resa of one of her most basic civil rights – the right to raise her child.  As discussed in more detail below, each of the co-conspirators played their part in the conspiracy and each is deemed under the law to be responsible for the injuries sustained by Resa as a result of any and all of their own actions and those of their co-conspirators, including Brad.

In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Ultimately, a grant of summary judgment is warranted when the record as a whole "could not lead a rational finder of fact to find for the non-moving party..." *Id.*  Here, there is no question that a rational finder of fact looking at the record as a whole could find in favor of Resa, and summary judgment in favor of the defendants should be denied.

## B. Specific Claims

As an initial matter, attorneys Nora Stelly and Desiree Williams represent the City of Opelousas and they have not enrolled on behalf of Claudette Gallow.  Officer Roylis Gallow is deceased and Claudette Gallow has been substituted in his place.  Therefore, it is improper for these attorneys to have filed a motion on behalf of Officer Roylis Gallow who is no longer a party to these proceedings.  Nevertheless, the arguments posed by Mmes. Stelly and Williams are addressed herein.

13

**1. Conspiracy Claim under 28 USCA §1983**

To establish a cause of action under 28 USCA §1983, Resa must establish (1) the deprivation of a right, secured by the Constitution or laws of the United States (2) by a person acting under color of state law. *Robertson v. Plano City of Texas*, 70 F.3d 21, 23 (5th Cir. 1995); *Irvin v. Foti*, 1999 WL 504916 (E.D. La. 1999).  Here, Resa claims that the conspiracy was to deprive her of her rights to care, custody, control, and management of her minor son, Cole. "That the Constitution protects family relationships and a parent's right to the care, custody, control, and management of their children is well-established." *Wooley, supra*, at 920-21.  The United States Fifth Circuit Court of Appeals has also recognized that the "most basic aspect of familial privacy" is "the right of the family to remain together without the coercive power of the state." *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988).  There is no question the course of conduct by the various actors listed above was an intentional scheme to use the power of the state to wrest custody of Cole from Resa and deprive her of her constitutionally protected right in parenthood.

Specifically, with regard to Officer Gallow, the evidence establishes that Officer Gallow was speaking on the phone with Brad on the morning of November 30, 2005 when Brad arranged to confound Resa regarding Cole's whereabouts and then have Cindy Hebert, a woman who previously served probation for threatening to kill Resa, use fighting words to provoke Resa.  Based upon the testimony of Officer Gallow at the custody proceedings, it is evident that the intention for this part of the conspiracy was to create a scene about which Officer Gallow, an ostensibly "unbiased" witness who as a police officer on duty at the time, would be a particularly credible witness, would be able to testify in an effort to paint Resa as unfit.

14

Officer Gallow was called as a witness by Brad on January 19, 2006.  At that time, neither Resa nor her counsel were aware that Officer Gallow and Brad knew each other and had together planned the entire Opelousas General Hospital fiasco.  Officer Gallow's testimony included the following:

(1) Officer Gallow was ostensibly at the hospital to visit his mother.[27]

(2) Some unidentified women sitting in the hospital motioned for Officer Gallow to move toward the hallway where he saw Resa "standing up, looked like looking at the ceiling and maybe talking to herself, which I didn't see no one else there."[28]  "I thought something was wrong, seriously speaking, because she was looking, talking to herself, spinning, turning around...."[29]

(3) Resa told Gallow, "There is going to be some trouble here."[30]

(4) Resa "violently jerked" Cole out of Brad's arms and then began to shove Cindy Hebert with her elbows until Officer Gallow got in between them.[31]

(5) That Resa began "walking again at a fast pace" which Officer Gallow "felt was a combative manner, you know, by looking in her face."[32]

(6) That Officer Gallow grabbed Resa by the shoulders and said "What's the problem?" to which she replied "I'm just upset because he was supposed to have been here with the child for 8 o'clock."  Officer Gallow then told her "Ma'am it's 8:03, 8:04, something like that."[33]

---

[27] Exhibit 7, Transcript of January 19, 2006 testimony of Roylis Gallow, p. 594, ll. 19 – 24.  Notably, the allegedly "innocent" reason for the visit was elicited by the following question from Brad's counsel, "Did you have occasion to visit your mother at the Opelousas General Hospital."
[28] *Id.* at p. 595, ll. 3 – 18.
[29] *Id.* at p. 598, ll. 25 – 27.
[30] *Id.* at p. 595, l. 20.
[31] *Id.* at p. 595, ll. 23 - 29.
[32] *Id.* at p. 596, ll. 2 - 3.
[33] *Id.* at p. 596, ll. 5 – 8.

(7)  Cindy Hebert then insisted that Officer Gallow do something about the "battery."[34]

This description of Resa's behavior as erratic and violent was then supposed to be contrasted with Brad's calm and cool demeanor when Brad's lawyer asked Officer Gallow "What kind of restraint did you observe Brad Griffith display."[35]  In response, Officer Gallow first attempted to demonstrate that he didn't know who Brad was, referring to him as "Grad," and then explaining how Brad was "punked" by a "little lady" [Resa] – meaning Resa was easily able to take Cole away from Brad - and that Brad didn't want to get involved in the problem between Resa and Cindy Hebert. [36]  Also, importantly, Officer Gallow admitted he used his cell phone to call the Opelousas Police Department while at the hospital with Brad and Resa.[37]

Officer Gallow appeared again two years later to testify on January 28, 2010.  This time, counsel for Resa was armed with the cell phone records of the various nefarious characters including Officer Gallow and Brad.  It turned out that Officer Gallow had been speaking with Brad at least since October 11, 2005 when they had a five minute conversation at 8:21 p.m.[38]  As can be seen from a review of Exhibit 58, as the Opelousas General Hospital set-up got closer, the calls between Brad and Officer Gallow got more frequent, and on the day of the fiasco, Brad and Officer Gallow called each other nine times between 7:27 a.m. and 2:56 p.m.  They were on the phone at 8:05 a.m. as Resa approached Officer Gallow at the hospital.

When questioned about this on January 28, 2008, Officer Gallow continued to insist that he never spoke to Brad on the phone.  Some of the questioning went as follows:

> Q:   Isn't it true you were on the phone with him [Brad] - - You deny
> being on the phone with him?

---

[34] *Id.* at p. 596, ll. 10 – 15. This description of the event is markedly different from what Resa claims occurred.  See section III, *supra* , and citations thereto.
[35] *Id.* at p. 597, ll. 12 – 13.
[36] *Id.* at p. 597, l. 28 – p. 598, l. 9, p. 600, ll. 11 – 22, p. 601, ll. 13 – 23.
[37] *Id.* at p. 603, l. 31, - p. 604, l. 4.
[38] Exhibit "58," Subscriber History for Cell Phone for Opelousas Police Dept R. Gallow – Nextel Cell Phone, p. 841.

A:     I didn't talk to Brad Griffin or Brad Griffith on that morning any way, shape, or form.[39]

&#42; &#42; &#42;

Q:     If your records indicate that your number and his cell phone number had a five-minute transaction, how would you explain that?

A:     Anybody, everybody I work with use my phone, ma'am. I don't know who could have been talking to him. If they did use my phone and call him or he called or whatever, I don't know. I didn't know this guy.[40]

&#42; &#42; &#42;

Q:     You deny speaking to him on November is [sic] 11th, '05, at 7:59 a.m. for one minute?

A:     I didn't speak to him.

Q:     Even though your cell phone records indicate there was a connection.

A:     It could be, yes ma'am. I didn't know this guy like you are trying to say I do.

Q:     Okay. 8:15 a.m. on 11/11/05, isn't it true your phone records indicate 23 minutes conversation with Mr. Griffith's phone records?

A:     Not he and I.

Q:     11/12/05, isn't it true you spoke to him two different occasions that day?

A:     Not myself and Mr. Griffin or Griffith, whatever his name maybe, ma'am.[41]

&#42; &#42; &#42;

Q:     Okay, so the 111 minutes of records prior to November 30th, '05, between you and Mr. Griffith you deny ever speaking to him?

---

[39] Exhibit "CC," Transcript of January 28, 2008 proceeding, p. 2113, ll. 7 – 10.
[40] *Id.* at p. 2113, ll. 24 – 30.
[41] *Id.* at p. 2116, ll. 17 – 31.  See also Exhibit 58, p. 841, supra note 38.

A:      Not me knowing if he was on the phone, no, ma'am.[42]

* * *

Q:      You still saying you never knew who Brad Griffith was?

A:      I met the guy for a short moment in time back in 2001 or 2000, even, when I went to get a tux for my son's prom or graduation and directed me where to go.

Q:      Okay.  Now, we are going to look at the day of the incident. 11/30/05.  You remember that Opelousas General Hospital incident?

A:      What time?

Q:      I'm going to look at your first phone call.  It shows an incoming call from - - Can you tell the Court who it's from, the number?

A:      The highlighted?

Q:      Yeah.

A:      278-3434. [established previously as Brad's cell phone number]

Q:      What time did you receive that call?

A:      Call came to my phone at 7:27 in the morning.

Q:      Did you speak to Mr. Griffith at 7:30?

A:      I didn't speak to him.

Q:      Okay.  What's the next call, 8:05 a.m.  Isn't it true you made a phone call to Mr. Griffith at 278-3432?

A:      I didn't call Mr. Griffith.

Q:      Isn't it true you had your cell phone with you in the hospital?

A:      Yes, I did.

Q:      How could someone else call Mr. Griffith from your cell phone if you had it on you that day?

---

[42] *Id.* at p. 2117, ll. 20 – 23.

18

A:      I may have called Joe.

Q:      This isn't what your records say.  It says you call [sic] Mr. Griffith.

A:      I don't know if Joe be using Brad Griffith's number when he calls me or not, ma'am.

Q:      That's not what I asked you.  You testified to this court on January 19, '06 - -

A:      I returned the call.

Q:      - - that at 8:00 a.m. you were in the hospital.

A:      Correct.

Q:      Visiting your mother, right?

A:      I went to visit my mom.

Q:      And you had your cell phone on you is what you said.

A:      Yes, I did.

Q:      Okay.  So why are you receiving a call at 8:05 - - why are you making a call to Mr. Griffith?

A:      I didn't call Mr. Griffith.

Q:      Was there anyone else in the hospital at 8:05 that borrowed your cell phone?

A:      No, ma'am.

Q:      So the records are wrong?

A:      The records are probably correct.  But me calling Mr. Griffith, God knows I've never called Mr. Griffith on that day.

Q:      Okay.  Let's look at 11/30, 8:06.  Isn't your call for backup to the hospital?

A:      Yes.  I called the Police Department.[43]

---

[43] *Id.* at p. 2118, l. 7 – p. 2119, l. 28.

Note that Officer Gallow's call to the police department was prior to the "incident" between Resa, Brad, and Cindy Hebert. It was immediately after he hung up the phone with Brad from their 8:05 a.m. call. As readily admitted now by Brad, all of Officer Gallow's contentions that he did not know Brad were lies. In response to Plaintiff's Request for Admission No. 1, Brad stated "I admit that prior to November 30, 2005 I knew Roylis Brent Gallow personally."[44]

In additional testimony elicited from Officer Gallow, it was also established on January 28, 2008 that Officer Gallow had regular contact with at least one of the other co-conspirators, Jan Huffman, from at least October 2005 through 2007.[45] It was also established that Officer Gallow spoke with Brad both before and after the two hearings which took place on January 30, 2006 and March 20, 2006 in Opelousas regarding the battery charge.[46] Officer Gallow appeared at both of those hearings to testify against Resa.

While Resa suspected there was something amiss, she had no evidence to establish Officer Gallow conspired with Brad. Had she been able to establish that, she would never have pled *no lo contedre* to the battery charge and there is no way she would have been convicted. What is important for this matter is the fact that Officer Gallow was clearly involved in Brad's conspiracy to deprive Resa of custody. He perjured himself at both the January 19, 2006 hearing and again at the trial on January 28, 2008. The purpose of his testimony was to help establish from a credible "unbiased" witness that Brad was a reasonable "constrained" fellow, while Resa was an unstable violent person. This fit with Brad's narrative in the custody trial that Resa was

---

[44] Exhibit "DD," Brad's Response to Plaintiff's Request for Admission No. 1.
[45] Exhibit "EE," Transcript of January 28, 2008 proceeding, p. 2124, ll. 5 – 11, l. 31 – p. 2125, l. 2.
[46] *Id.* at p. 2129, l. 17 – p. 2130, l. 12. See also, Exhibit 58, p. 842-43.

unfit and a child abuser.  Brad used the "incident" to make the same points during his testimony

on January 19, 2006.[47]

Officer Gallow's testimony had the intended effect.  The judge stated in its ruling on

January 19, 2006:

> Okay.  Let me just say Mr. Griffith, I hope he doesn't take offense
> to Officer Gallow's remark about him being punked.  Actually, sir,
> that was a compliment that you didn't get yourself in the fray.  It
> was smart of you not to.  You probably did yourself a lot of good
> in that respect.[48]

A few months after Officer Gallow's testimony and largely as a result of his testimony on

January 19, 2006, Resa lost custody of Cole during pre-trial proceedings.[49]  As stated by the trial

court in its Reasons for Ruling:

> In open court on May 1, 2006, in keeping with Dr. LeCorgne's
> recommendations, the Court ... ordered that RESA's custodial
> periods with the minor child be supervised until Dr. LeCorgne was
> satisfied that she had progressed sufficiently in individual therapy
> to lift the supervision.[50]

Resa not only lost custody of Cole, she was limited partially to supervised visitation with no

overnight visits for a period of time.  Resa was finally restored to at least a 50/50 time sharing

arrangement when the trial court rendered its ill-conceived judgment on March 27, 2008.[51]  That

travesty was finally reversed in its entirety and Resa was granted sole custody by the March 3,

2010 judgment of the Louisiana Third Circuit Court of Appeal.[52]  As a result of the actions of all

---

[47] Exhibit 19, p. 667, l. 22 – p. 668, l. 5; p. 669, l. 29 – p. 670, l. 1.
[48] Exhibit 24, p. 682, ll. 5 – 11.
[49] Exhibit "X," Transcript of May 1, 2006 hearing [R. Vol. I, pp. 161-66]; Exhibit Y, Records of Dr. Lyle LeCorgne on which his recommendations to the trial court were based, pp. MED.0009.LLL, MED.0018.LLL, MED.0040.LLL – MED.0043.LLL, MED.0091.LLL – MED.0092.LLL  (under seal).
[50] Exhibit 94, p. 2.
[51] As the Third Circuit found, the trial court largely got the facts right, but it applied them to the law incorrectly. Exhibit FF, Ruling of the Third Circuit Court of Appeal, p. 7.
[52] Exhibit "FF."  Unfortunately, the conspiracy continues to bear fruit as the Louisiana Supreme Court granted writs to hear the case.

the co-conspirators including Officer Gallow, Resa's care, custody, control, and management of Cole was severely restricted for nearly four years, from May 1, 2006 through March 3, 2010.

There is no question that the actions set forth above constitute a conspiracy to deprive Resa of her rights to care, custody, control, and management of Cole.  There is no question that Officer Gallow used his position as a police officer with the City of Opelousas to help Brad create evidence (i.e. a battery conviction) and to provide perjured testimony in the custody proceeding as an allegedly unbiased witness so that he could help paint Brad as "constrained" and Resa as unfit, unstable, and violent.[53]  This is sufficient to establish a claim under § 1983 pursuant to the requirements enunciated in *Robertson v. Plano City of Texas*, *supra*.  It shows (1) the deprivation of a right, secured by the Constitution of laws of the United States (2) by a person acting under color of state law. *Id.* at 23.

The City and Officer Gallow claim that Resa must establish (1) an agreement between private and public defendants to commit an illegal act and (2) an actual deprivation of constitutional rights. (Memorandum in Support, p. 3).  The evidence listed above establishes both.  Resa's loss of the care, custody, control, and management of Cole was an actual deprivation of her constitutional rights.  The actions of Brad and Officer Gallow were most certainly illegal – conspiracy to provide perjured testimony and conspiracy to obstruct justice at a minimum.  Additionally, while the courts have referenced "illegal" acts, there is no reason to limit the object of conspiracies to illegal acts rather than tortious acts.  Torts can be the basis of § 1983 claims, and torts can be the basis for a conspiracy. *Butz v. Lynch*, 97-2166 (La.App. 1 Cir. 4/8/98), 710 So.2d 1171, 1174 (to recover for conspiracy, "a plaintiff must prove that an agreement existed to commit an illegal or tortious act which resulted in the plaintiff's injury."). As explained in *Butz*:

---

[53] In addition to the evidence cited herein, see Exhibit 94, pp. 8 – 9.

> It has been stated that if a conspiracy is conceived and executed
> and an injury results, the injured person has a cause of action
> against all of the conspirators, who may be held civilly liable for
> damage to a third party resulting therefrom.

*Id.*  Additionally, proof of a conspiracy may be made by direct or circumstantial evidence. *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir. 1979) ("[C]onspirators rarely formulate their plans in ways susceptible of proof by direct evidence). See also *State of Louisiana v. Johnson*, 438 So.2d 1091, 1099 (La. 1983).  Even in the context of criminal conspiracies, each co-conspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise. LSA-R.S. 15:455.  The conspiracy becomes actionable as soon as one co-conspirator does an act in furtherance of the object of the agreement. *Johnson, supra*, at 1099.

Moreover, when as here, the scheme or conspiracy itself has as its object the deprivation of the plaintiff's constitutional right, then the conspiracy to deprive a person of that right is itself actionable under § 1983.  As stated by the United States Fifth Circuit Court of Appeals:

> To state a cause of action under § 1983, [a plaintiff] must allege
> that some person, acting under state or territorial law, has deprived
> him of a federal right.

*Cinel v. Connick*, 15 F.3d 1338, 1342 (5th Cir. 1994) (citing *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S. Ct. 1920, 1923, 64 L. Ed. 2d 572 (1980); *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 387 (5th Cir.1985), *cert. denied*, 488 U.S. 848, 109 S. Ct. 129, 102 L. Ed. 2d 102 (1988).

In *Cinel*, the U.S. Fifth Circuit found it particularly pertinent that the plaintiff did not allege a conspiracy, or scheme, intended to deprive him of a constitutional right.  The court stated:

> [N]othing in his complaint implies or states that these Appellees
> agreed to undertake a scheme to deprive Appellant of his
> constitutional rights.

*Id.* at 1343-44.   Here, Resa specifically claims that the defendants, along with other co-conspirators, agreed to undertake a scheme to deprive Resa of her constitutional rights and the evidence clearly supports a finding not only that they agreed to the scheme but that they each carried out their parts.   In the underlying custody litigation, both the trial court and the Third Circuit Court of Appeal found that such a conspiracy existed.[54]   That is sufficient to make out a claim under § 1983.

## 2.  Qualified Immunity

Officer Gallow claims that he has qualified immunity because his actions were "objectively reasonable."   Officer Gallow's focus is misplaced, however.   He argues that in light of what he witnessed at Opelousas General Hospital, the action in citing Resa for battery (and presumably subsequently appearing to testify against her at her trial for battery) were reasonable given his version of the facts.   Even assuming this should be the focus of the inquiry, he would be wrong since Officer Gallow cannot conspire with an individual to create a fiasco and then claim that he is qualifiedly immune for his actions following the manufactured scene.

Regardless, this is not the conspiracy that Resa has sued upon.   It is the broader conspiracy to deprive her of custody of Cole.   The Opelousas General Hospital incident formed part of that broader conspiracy as outlined above.   Officer Gallow's testimony on January 19, 2006 and again on January 28, 2008 were additional steps taken in that conspiracy by Officer Gallow himself.   The test for qualified immunity is stated as follows:

> A state officer entitled to qualified immunity can be held accountable for his official actions only if it is shown that he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the person affected or that he acted with subjective intent to harm the plaintiff.

---

[54] Exhibits 94 and FF.

Crowe v. Lucas, supra, at 990.   Here, there is no question that Officer Gallow **both** knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of Resa, and that he acted with the subjective intent to harm Resa.

Additionally, Officer Gallow's conduct violated a clearly established right (parenthood) of which a reasonable person would have known. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992).  Officer Gallow's claims of qualified immunity are without merit.

**3. Witness Immunity**

Officer Gallow also claims that he is entitled to immunity as a witness.  In other words, Officer Gallow argues he can shield himself from liability from the conspiracy he participated in - which was intended to and did use his position as a police officer to bolster his credibility when providing perjured testimony about a fiasco he was involved in creating and by which he specifically intended to deprive Resa of her constitutional rights – on the basis that the conspiracy was furthered by testimony at a civil trial.  This is ridiculous on its face.

Additionally, witness immunity is intended to protect the truth-finding process, not create loopholes for conspirators who happen to further their conspiracy through perjured testimony at a trial.  Just as in the case of an expert witness who happens to provide testimony as part of the services he provides to his client is not immune from liability for his negligence in providing services to the client, a conspirator who uses the court system to further his conspiracy does not thereby create immunity for his actions.

In *Marrogi v. Howard*, 805 So.2d 1118, 1131-32 (La. 2002), the Louisiana Supreme Court answered a certified question from the U. S. Fifth Circuit and explained:

> After reviewing the cases from the courts of our sister states, as
> well as the applicable policy considerations, we hold that claims in

connection with a retained expert's alleged failure to provide competent litigation support services are not barred by the doctrine of witness immunity. The privilege of witness immunity in Louisiana has been applied in defamation and defamation-like cases, as well as retaliation cases against adverse witnesses, expert and otherwise. The policy underlying that rule is that witnesses must be permitted to speak freely and without fear of exposure to vexatious litigation where a search for the truth is before the fact-finder. However, that laudable objective is not advanced by immunizing the incompetence of a party's retained expert witness simply because he or she provides professional services, including testimony, in relation to a judicial proceeding. Witness immunity itself is an exception to tort liability, and thus should be narrowly construed in light of our Civil Code's provision that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315. Furthermore, immunity from tort liability is, generally, recognized only to promote an overarching public purpose.

We agree that the finder of fact must be able to rely on "candid, objective, and undistorted evidence." *Briscoe v. LaHue*, 460 U.S. at 333, 103 S.Ct. at 1114. However, we do not believe that shielding a client's own professional witness from malpractice liability is necessary to ensure that frank and objective testimony is presented to the fact-finder.

Just as the laudable objective of witnesses speaking freely is not advanced by immunizing expert witness incompetence, it is not furthered by immunizing the actions of a co-conspirator seeking to deprive a woman of the care, custody, control, and management of her child. Even immunity of a judge in a judicial proceeding could be overcome if an outside conspiracy were established regarding the judicial proceedings themselves. The U. S. Fifth Circuit noted that possibility in *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982), when approvingly quoting from the trial judge's ruling in which he stated:

There could, of course, I think, be a possibility of a complaint against the Judge which would vitiate judicial immunity if some outside conspiracy were shown.

The conspiracy of which Officer Gallow was a part undoubtedly vitiates whatever immunity he might otherwise be provided under law.  Additionally, at least one Louisiana court has specifically recognized a cause of action for damages that flow from judicial relief that was granted on the basis of perjured testimony as was the case here. See *Broussard v. Broussard*, 544 So.2d 109 (La.App. 3 Cir. 1989).

**4. State Law Claims**

In addition to the § 1983 claim, Officer Gallow is liable for several state law claims.  The City of Opelousas, while not liable for the § 1983 claim, is vicariously liable for the additional state law claims.  Officer Gallow and the City filed motions for summary judgment only on the intentional infliction of emotional distress claim, however, each of the state law claims against Officer Gallow and the City of Opelousas are addressed briefly below.

**a. Conspiracy to Abuse the Judicial Process**

In *Broussard v. Broussard, supra*, the Louisiana Third Circuit Court of Appeal stated:

> We believe that the law does afford a remedy to persons in instances in which judicial relief was obtained by a party when the facts upon which such relief was based were untrue.

*Broussard*, at 110. See also *Edmond v. Hairford*, 539 So.2d 815 (La.App. 3 Cir. 1989) ("The fact that defendant's actions did not amount to malicious prosecution or false imprisonment is not fatal to plaintiff's cause. As we noted earlier, Article 2315 of our Civil Code is broad enough to cover the tortious conduct of defendant and justify recovery of damages.")  This principle applies here where Resa was deprived of custody of Cole at least partly based upon the concocted fiasco at Opelousas General Hospital and the perjured testimony of Officer Gallow regarding that incident.  Moreover, as one of the co-conspirators in the broader conspiracy, Officer Gallow is

responsible for all of the actions of each of the other co-conspirators, including Brad, Jan, Jessica, Senator Cravins, and the others.

### b. Conspiracy to Commit Fraud/Deceit

In Louisiana, fraud is defined as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other party." Louisiana Civil Code article 1953. Here, there is no question that Officer Gallow, in helping to organize the fiasco at Opelousas General Hospital and then in providing perjured testimony to assist in the custody trial, engaged in conduct that was a misrepresentation of the truth made with the intention to provide Brad an unjust advantage and to cause a loss to Resa.

### c. Intentional Infliction of Emotional Distress

Officer Gallow and the City of Opelousas correctly state that to establish intentional infliction of emotional distress, Resa must establish (1) that the conduct of the defendant was extreme and outrageous, (2) that the emotional distress suffered by the plaintiff was severe, and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.  To suggest that the actions of Officer Gallow and his co-conspirators listed above are not extreme and outrageous is simply preposterous.  Additionally, Resa has indeed suffered emotional distress that is severe as a result of those actions.[55]  Furthermore, the jury can easily determine from the evidence that Officer Gallow either desired to inflict severe emotional distress or knew that severe emotional distress was substantially certain to result from his conduct and that of his co-conspirators.

---

[55] Exhibit "GG," June 11, 2010 Affidavit of Resa Latiolais.

28

#### d.  Invasion of Privacy

In Louisiana, "the cause of action known as 'invasion of privacy' has long been recognized and pronounced by the jurisprudence of this State." *Norris v. King*, 355 So.2d 21, 23 (La.App. 1 Cir. 1978).  The right of privacy is "the right to be let alone" or "the right to live one's life in seclusion without being subjected to unwarranted and undesirable publicity." *Id.* Malicious intent is not a necessary element. *Id.*  The claim includes action that puts the plaintiff in a false light in the public eye. *Id.*  It also includes harassment that is unreasonable and that seriously interferes with the plaintiff's privacy. *Id.* at 25.  Here, the actions of Officer Gallow and his co-conspirators painted plaintiff in public judicial proceedings in a false light, caused her to be arrested and even criminally prosecuted based upon false and manufactured evidence, and seriously interfered with her privacy.  The actions of Officer Gallow and his co-conspirators was also unreasonable harassment that interfered with her "right to be let alone."  These actions are actionable in Louisiana and Officer Gallow is responsible for his actions and those of his co-conspirators.

#### e.  False arrest and Imprisonment

Co-conspirator, Jessica Harbin, had Resa arrested for allegedly committing aggravated assault by trying to run Harbin over with her car.  As a result of these completely false accusations, Resa was arrested and imprisoned for a night.[56]  This conspiracy formed part of the broader conspiracy to deprive Resa of custody of Cole, and as a result, all of the co-conspirators are liable therefore.

#### f.  Harassment and/or Stalking

The crime of telephone harassment includes making "repeated telephone communications … in a manner reasonably expected to annoy, abuse, torment, harass, embarrass, or offend

---

[56] *Id.*

another, whether or not conversation ensues." LSA-R.S. 14:285.    Stalking includes "the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or suffer emotional distress."   Here, the actions of co-conspirators, Jan Huffman and Jessica Harbin, included both telephone harassment and stalking.[57]   Officer Gallow is responsible for the actions of his co-conspirators.

## 5. Prescription

The actions attributable to each of the members of the conspiracy are attributable to Officer Gallow. *Johnson, supra*, at 1099; LSA-R.S. 15:455.   As has been explained, those actions continued through the end of the custody trial.   Officer Gallow himself continued the conspiracy when he gave additional perjured testimony on January 28, 2008.

In Louisiana, prescriptive statutes are to be strictly construed against prescription and in favor of the obligation sought to be extinguished; of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted. *Bustamento v. Tucker*, 607 So.2d 532, 537 (La. 1992).   Additionally, in cases involving continuous torts, prescription does not begin to accrue until the last tortious act.   Officer Gallow and the City of Opelousas argue that this matter consists of discreet acts that are not a continuous tort.   They are wrong. "Where the cause of injury is a continuous one giving rise to successive damages, prescription does not begin to run until the conduct causing the damage is abated." *Scott v. The American Tobacco Company, Inc.*, 04-2095 (La.App. 4 Cir. 2/7/07), 949 So.2d 1266, 1280 (citing *Risin v. D.N.C. Investments, LLC*, 05-415 (La.App. 4 Cir. 12/7/05), 921 So.2d 133 and *South Central*

---

[57] *Id.*; Exhibit 2, Photo of Jan Huffman's vehicle; Exhibit 3, video tape of Jan Huffman's vehicle passing and honking (video not attached); Exhibit 6, October 16, 2006 testimony of Jessica Harbin, p. 512, l. 5 – p. 513, l. 1, p. 521, ll. 11 - 19, p. 522, l. 31 – p. 523, l. 1; Exhibit 62, Certified copy of suit number 20063633 (Huffman v. Latiolais).

*Bell Telephone Co. v. Texaco, Inc.*, 418 So.2d 531 (La. 1982).   As explained further by the Louisiana Fourth Circuit Court of Appeal:

> [T]he continuing and repeated wrongful acts are to be regarded as a single wrong which gives rise to and is cognizable in a single action, rather than a series of successive actions.   Therefore, the date for commencing the accrual of prescription of an action based on the single wrong is the date of the last wrongful exposure, and the single action may be filed within the prescriptive period reckoning from the cessation of the continuing wrongful acts.

*Id.* (quoting *Wilson v. Hartzman*, 373 So.2d 204 (La.App. 4 Cir. 1979)).   Further, "the continuous tort doctrine does not encompass the plaintiff's knowledge in order to decide when prescription will begin to run." *Id.* (citing *Coulon v. Witco Corp.*, 03-208 (La.App. 5 Cir. 5/28/03), 848 So.2d 135, 138.

Here, Resa lost custody of Cole as a result of the conspiracy and continuous actions of the co-conspirators described above from May 1, 2006 through March 3, 2010.   Additionally, with each day of trial, she continued to incur attorneys' fees and expenses associated with that trial at which she was forced to defend herself against the conspiracy.   The continuing and repeated wrongful acts by the co-conspirators continued through the close of the custody trial. As a result, prescription does not begin to accrue until the last wrongful act which would include the last day of trial.   Officer Gallow's last wrongful act was on January 28, 2008 - within one year of the filing of this suit.

Moreover, in cases in which a continuous course of conduct or pattern of harassment gives rise to a claim, prescription does not begin to run for the entirety of the claim based upon that pattern of behavior until the last incident forming part of the pattern. *Bustamento, supra*, at 542-43.

The Louisiana Fourth Circuit Court of Appeal explained this concept as follows:

31

> In *Bustamento*, an action for intentional infliction of emotional distress resulting from sexual harassment, the Louisiana Supreme Court held that the one-year prescriptive period did not commence until the last act occurred or the conduct abated. *Bustamento* at p. 542. The *Bustamento* court found the doctrine of continuing tort applicable because the acts or conduct were continuous, were perpetrated by the same actor, were of the same nature, and the conduct became tortious by virtue of its continuous, cumulative, and synergistic nature. *Id.*

*Risin, supra*, at 136 (citing *Bustamento, supra*, at 542).

Here, the actions of Brad and his co-conspirators against Resa were "continuous, were perpetrated by the same group of actors, were of the same nature in that they had the same object, and the conduct" was "continuous, cumulative, and synergistic" in nature.  The overall scheme or pattern in which the various co-conspirators acted is in itself tortious.

Lastly, as stated previously, each of the co-conspirators is solidarily liable with each other for the entirety of the conspiracy. *Johnson, supra*, at 1099; LSA-R.S. 15:455.  As explained by the U. S. Fifth Circuit Court of Appeals:

> Questions of solidary liability in Louisiana are governed by La. Civ. Code art. 2324, section (A) of which reads: "He who conspires with another person to commit an intentional or willful act is answerable, *in solido*, with that person, for the damage caused by such act." This article was amended in 1987. Its prior version stated: "He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, *in solido*, with that person, for the damage caused by the act." In *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 51 F.3d 553 (5th Cir. 1995), we interpreted the amended version, stating:
>
>> Although the 1987 amendments changed the language of La. Civ. Code art. 2324(A), the pre-amendment conspiracies still provide guidance as to the applicable law in regards to conspiracies. *National Union Fire Ins. Co. v. Spillars*, 552 So. 2d 627, 634 (La. Ct. App. 1989), *writ denied*, 556 So. 2d 61 (La. 1990) (stating that the 1987 amendment to art. 2324 "rephrased it in terms of conspiracy, conformably to prior jurisprudence").

32

*Id.* at 557 n.2. We also set out the legal standard established by this provision:

> The unlawful act is tortious conduct. The action is for damages caused by acts committed pursuant to a formed conspiracy, and all of the conspirators will be regarded as having assisted or encouraged the performance of those acts. The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy. This assistance or encouragement must be of such quality and character that a jury would be permitted to infer from it an underlying agreement and act that is the essence of the conspiracy.

*C&B Sales & Service, Inc. v. McDonald*, 95 F.3d 1308, 1315-16 (5th Cir. 1996).  Here, there is no question the jury can find from the evidence to be presented that a conspiracy existed to deprive Resa of her custodial rights.   Interruption of prescription against one solidarily liable tortfeasor interrupts prescription against all solidarily liable tortfeasors. LSA-C.C. articles 1799 and 3503.   Therefore, as prescription was interrupted by the act of Officer Gallow himself on January 28, 2008, the last day of trial, prescription did not commence to run until at least that day and suit was filed within one year – on January 8, 2009.

**6. Vicarious Liability of the City of Opelousas**

The City of Opelousas correctly claims that, under the circumstances of this case, it cannot be held liable for the actions of Officer Gallow under § 1983.   However, the City is most certainly vicariously liable *in solido* for the actions of Officer Gallow for the various state law tort claims. See *Braud v. Painter*, 730 F.Supp. 1 (M.D. La. 1990) ("The City of Gonzales, as the employer of the officers, is liable in solido with [Officer] Painter for the head injuries and is liable in solido with Painter and [Officer] Gonzales for the knee injuries and is liable in solido with Painter for the ankle injuries.")

33

In Louisiana, vicarious liability of municipalities for the actions of police officers and other employees is governed by Louisiana Revised Statute 9:2798.1 which provides in pertinent part:

> B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
>
> C. The provisions of Subsection B of this Section are not applicable:
>
> * * *
>
> (2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

In describing this statute, the Louisiana Supreme Court stated:

> [T]he Senate made several significant amendments to the bill, including deleting the traditional public duty doctrine exemption, but adding the present exemption for public entities from liability for failure to exercise discretionary duties in the lawful scope of their employment, and adding a provision *creating liability for public entities for criminal, fraudulent, malicious, intentional, willful, outrageous, reckless or flagrant misconduct.*.

*Hardy v. Bowie*, 98-2821 (La. 9/8/99), 744 So.2d 606, 613 (emphasis added).

Here, there is no question that the actions of Officer Gallow, even if they fell within the ambit of section B of the statute, are indeed criminal, fraudulent, malicious, intentional, willful, outrageous, *and* flagrant misconduct. As stated by the Louisiana Supreme Court, LSA-R.S. 9:2798.1 creates liability on the part of the municipality for such conduct. *Id.* See also *Turner v. Houma Municipal Fire*, 2002 U.S. Dist. Lexis 12924 (E.D. La. 2002) (holding that "to the extent that Plaintiff could establish that any of the conduct at issue was in fact motivated by racial bias, the discretionary immunity statute would likely afford no protection to such illegitimate

34

conduct); *Ducote v. City of Alexandria*, 95-1269 (La.App. 3 Cir. 7/17/96), 677 So.2d 1118 (holding city liable for conversion of plaintiff's vehicle by police officer); *White v. Rapides Parish School Board*, 03-1172 (La.App. 3 Cir. 3/3/04), 867 So.2d 146 (holding material issues of fact remained regarding whether actions of School Board's employees constituted malicious, intentional, willful, outrageous, reckless or flagrant misconduct).

**7. Damages**

Resa has incurred substantial economic damages as a result of the conspiracy against her. In addition to her attorneys' fees and costs associated with the custody trial, she incurred attorneys' fees and costs as a result of the battery charge and in connection with the various restraining orders that she was required to prosecute and defend.  She also incurred costs with a psychologist with whom she was ordered to undergo psychotherapy to deal with her alleged anger problems demonstrated by the various actions of the defendants and their co-conspirators. Moreover, she is entitled to general damages for the various claims resulting from the psychological and emotional injuries she has sustained as a result of the actions of the co-conspirators.

## V. CONCLUSION

Resa endured constant attacks from Brad and his many cohorts including defendants, Roylis Gallow and Donald Cravins, as well as Cindy Hebert, Jan Huffman, Jessica Harbin, Theresa Boatner, and others.  The conspiracy in which each of these individuals participated was intended to deprive Resa of the care, custody, control, and management of her son, Cole.  The conspiracy led to Resa's prosecution for battery, to her arrest for aggravated assault for which she spent the night in jail, to her involvement in multiple hearings regarding restraining orders, and most importantly, to the loss of custody of her son, Cole, for a period of nearly four years.

Resa sustained substantial economic and non-economic damages and all of the defendants are liable, *in solido*, for the damages incurred as a result of the conspiracy against her.

Respectfully submitted,

**JULIE KOREN VAUGHN FELDER, APLC**

JULIE VAUGHN FELDER #25047
P.O. Box 80399
Lafayette, Louisiana 70598
Telephone: (337) 856-3444
Facsimile: (337) 856-3447

AND

**HUVAL, VEAZEY, FELDER,**
**AERTKER & RENEGAR, LLC**

By:_____

**BRADFORD FELDER #25046**
G. ANDREW VEAZEY #21929
STACY N. KENNEDY #23619
2 Flagg Place
Lafayette, LA 70508
Telephone: (337) 234-5350
Facsimile: (337) 234-5310
**ATTORNEYS FOR PLAINTIFF, RESA LATIOLAIS**

## CERTIFICATE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record through the court's electronic filing system and/or by facsimile and/or by depositing a copy of same in the U.S. Mail, properly addressed, with sufficient postage affixed thereto.

Lafayette, Louisiana, this 17th day of June, 2010.

_____
BRADFORD H. FELDER

36